**Certiorari Denied, June 29, 2016, No. S-1-SC-35927**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2016-NMCA-066**

**Filing Date:  May 13, 2016**

**Docket No. 33,861**

**STATE OF NEW MEXICO,**

> **Plaintiff-Appellee,**

**v.**

**MICHAEL A. ESTRADA,**

> **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Douglas R. Driggers, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Walter Hart, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Kathleen T. Baldridge, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**HANISEE, Judge.**

**{1}**     Defendant appeals his conviction for conspiracy to commit forgery, arguing that there was insufficient evidence to support the jury's verdict and that the district court erred in denying his motion to dismiss the indictment on speedy trial grounds. We affirm.

1

## I.   BACKGROUND

**{2}**   We divide our narrative of the facts into two parts: (A) facts relevant to Defendant's motion to dismiss on speedy trial grounds, and (B) facts relevant to Defendant's challenge to the sufficiency of the evidence in support of his conviction for conspiracy to commit forgery. We adopt the district court's findings of fact with respect to its denial of Defendant's speedy trial motion to the extent its findings are supported by substantial evidence. *State v. Spearman*, 2012-NMSC-023, ¶ 19, 283 P.3d 272. Similarly, we recite the facts relevant to Defendant's sufficiency of the evidence challenge to his conviction in the light most favorable to the jury's guilty verdict. *See State v. Chavez*, 2009-NMSC-035, ¶ 11, 146 N.M. 434, 211 P.3d 891.

### A.   Facts Relevant to Defendant's Motion to Dismiss on Speedy Trial Grounds

**{3}**   On November 12, 2010, the State filed a criminal complaint in magistrate court charging Defendant with four counts of forgery in violation of NMSA 1978, Section 30-16-10(A), (B) (2006). Defendant was arrested on November 19, 2010. On December 9, 2010, Defendant was charged in district court by grand jury indictment of four counts of forgery and one count of conspiracy to commit forgery. The State dismissed the magistrate court case without prejudice the following day.

**{4}**   Defendant was arraigned on the district court criminal complaint on December 27, 2010. The district court set Defendant's bond at $15,000. On January 21, 2011, Aric Elsenheimer, Defendant's public defender, filed an entry of appearance and request for discovery, as well as a demand for speedy trial. On February 21, 2011, Mr. Elsenheimer filed a written motion for a reduction of Defendant's bond.

**{5}**   On February 25, 2011, the State moved to join Defendant's case with pending cases against his two alleged co-conspirators. The district court entered notices scheduling a hearing on the State's joinder motion and Defendant's motion to reduce bond for April 7, 2011. On April 4, 2011, for reasons unexplained in the record, the district court vacated the motion hearing.

**{6}**   On May 2, 2011, Pedro Pineda filed an entry of appearance on Defendant's behalf. (Mr. Elsenheimer did not file a motion to withdraw or substitute, but it appears that this was the effect of Mr. Pineda's entry of appearance because Mr. Elsenheimer did not participate in the case from this point onward.) On July 25, 2011, Defendant posted bond and was released from incarceration. On August 22, 2011, the district court entered a notice scheduling a jury trial for Defendant's charges on October 4, 2011. On September 29, 2011, the State filed a motion to continue the October 4, 2011, trial referencing its pending motion to join Defendant's case with one of his alleged co-conspirator's. The motion stated that "Defense counsel, [Mr.] Pineda, does not oppose this [m]otion." On September 30, 2011, the district court granted the State's motion to continue and vacated the October 4, 2011, trial setting.

**{7}** On February 2, 2012, the State filed a request for a hearing on its motion to join. A hearing on the motion was scheduled to take place on February 15, 2012, and on February 16, 2012, the State filed an amended motion to join that sought to join Defendant's case with the case against only one of Defendant's alleged co-conspirators, Richard M. Tow.[1] Defendant's attorney did not oppose the motion. On February 17, 2012, the district court entered an order joining Defendant's case with Mr. Tow's. On March 13, 2012, the district court entered a notice setting a jury trial for April 26, 2012.

**{8}** On April 11, 2012, Defendant filed a pro se motion to dismiss counsel. In the motion, Defendant asserted that his attorney, Mr. Pineda, had failed to communicate with him and that his right to a speedy trial had been violated. Defendant noted "[m]y trial is [set for] the 26th of April, and I need an [a]ttorney to prepare for my trial because I am innocent and I am taking this case to trial." Defendant's motion was mailed to the district court in an envelope that listed the Luna County Detention Center as a return address. On April 13, 2012, the district court scheduled a hearing on Defendant's pro se motion to take place on April 19, 2012.

**{9}** On April 18, 2012, Defendant's attorney filed a motion to withdraw. In it, Mr. Pineda asserted that Defendant's pro se motion to dismiss him as his attorney had caused "the attorney client relationship [to] deteriorate[] beyond repair[.]" Mr. Pineda argued that Defendant's assertion that he had never met or communicated with his attorney was refuted by the fact that the arguments in his motion to dismiss counsel were based on information that could only be gleaned from discovery that the State had provided to Mr. Pineda, which Mr. Pineda had in turn provided to Defendant. Mr. Pineda asserted that Defendant had been arrested for a probation violation on September 8, 2011, and again released on October 13, 2011, but had failed to comply with a condition of release requiring him to stay in contact with his attorney. Mr. Pineda also stated that Defendant was arrested for another probation violation on February 14, 2012, and that "he has been incarcerated ever since." Mr. Pineda explained that Defendant's dissatisfaction with Mr. Pineda likely stemmed from his being "very unhappy" with the State's plea offer, which Mr. Pineda had conveyed to Defendant. Finally, Mr. Pineda stated that "Defendant . . . [has] consulted with local attorney Mike Lilley, [and] Mr. Lilley told [Defendant] he would sue me and he would take over [Defendant's] criminal case as well."

**{10}** On April 19, 2012, Defendant, again pro se, filed a motion for setting and telephonic hearing, in which he asserted that the indictment against him should be dismissed for "due process" and speedy trial violations. The district court held a hearing on April 20, 2012. At the beginning of the hearing, Defendant explained that he had filed a separate motion for a

---

[1]Although this information is not part of the record, Defendant represents in his brief in chief that the reason the State no longer sought to join his case with the other alleged co-conspirator's case was because that co-conspirator had pleaded guilty to the charges against her.

telephonic hearing because he lived in Deming, New Mexico. Defendant also admitted that he had in fact met with Mr. Pineda once.

**{11}** Defendant disputed that he had hired another attorney to replace and sue Mr. Pineda, explaining that Mr. Pineda's assertion in his motion to withdraw must have been the result of a "misunderstanding." In response, Mr. Pineda called his assistant to give testimony as a witness. Mr. Pineda's assistant testified that she had only spoken to Defendant once, when Defendant had called from jail to say that he planned to hire Mr. Lilley to sue Mr. Pineda for unstated reasons and to represent Defendant in his criminal case.

**{12}** The prosecutor explained that the State's primary concern was how the delay that would result from granting Defendant's motion to dismiss his attorney would be assigned for speedy trial purposes. Notwithstanding these concerns, the district court granted Defendant's motion to dismiss counsel and Mr. Pineda's motion to withdraw. The district court stated that "it appears to this court that the parties will not be prepared for trial" and directed Mr. Pineda to prepare form orders granting each motion and continuing the trial. The district court asked Defendant personally whether he approved the "form" of the orders, and Defendant orally did so.

**{13}** On May 11, 2012, the district court entered orders granting Defendant's oral motion to continue, his motion to dismiss counsel, and Mr. Pineda's motion to withdraw as counsel. The district court reset Defendant's jury trial for July 31, 2012. On June 11, 2012, Defendant's replacement contract defender, Peter Giovannini, filed a notice of appearance, demand for discovery, and a speedy trial demand.

**{14}** On July 23, 2012, Defendant's attorney filed a motion to vacate the July 31, 2012, jury trial. The motion cited Defendant's confusion as to who in fact was representing him, Defendant's request to take statements by several witnesses for the State and witnesses that Defendant intended to call to testify in his defense at trial. The motion stated that "[u]ndersigned counsel agrees that any delay arising from this continuance should be attributed to the defense for purposes of any speedy trial analysis." The district court granted Defendant's motion to continue and vacated the July 31, 2012 trial setting, which was reset for October 11, 2012.

**{15}** On September 25, 2012, Defendant's attorney filed a motion to vacate the October 11, 2012, trial setting, stating that Defendant had been released from prison to serve the remainder of his sentence at a halfway house, and that "Defendant . . . is unable to communicate with undersigned counsel regarding [this case] because [he] is fearful that the [halfway house] will give him an 'unsuccessful release' from the program[,] which will violate his probation." The motion explained that "if the [halfway house] is aware of pending charges, he will be released from the program." The motion stated that "[u]ndersigned counsel and Defendant respectfully request that this matter be vacated and rescheduled after April[] 2014 to allow [D]efendant . . . to successfully complete the [halfway house s]ubstance [a]buse [t]reatment [p]rogram[.]" The State opposed the motion.

**{16}** On October 3, 2012, the district court held a hearing on Defendant's motion to continue. Defendant was not in attendance but his attorney reiterated that Defendant wanted to stay the proceedings until after April 2014 in order to allow him an opportunity to successfully complete the terms of his probation in an unrelated case. The State explained its opposition to the motion, arguing that granting Defendant's motion to continue would raise speedy trial problems and cause "hardship" to the parties. Finally, the State called a probation officer as a witness, who testified that Defendant had left the halfway house because of a "medical injury." The witness also testified that he had seen text messages Defendant had sent to in September to the mother of Defendant's son stating that he was "on the run."

**{17}** The district court recessed the hearing in order for the attorneys for the State and Defendant to attempt to locate Defendant. After the recess, both the State's attorney and Defendant's attorney said they were unable to locate Defendant, and that he was not at the Luna County Detention Center. The district court did not rule on Defendant's motion to continue and issued a bench warrant for Defendant's arrest.

**{18}** On October 9, 2012, Defendant's attorney filed another motion to continue. The motion stated that on the same day as the hearing on Defendant's earlier motion to continue, "Defendant . . . contacted [Mr. Giovannini's] office stating he was release[d] from the [halfway house] to have surgery but he would return to the program[.]" The motion also stated that "[u]ndersigned counsel agrees that any delay arising from this continuance should be attributed to the defense for purposes of any speedy trial analysis." The State did not oppose Defendant's renewed motion to continue. The district court granted the motion.

**{19}** On October 29, 2012, the State filed a request for a jury trial setting, and a few days later the district court entered a notice setting trial for December 17, 2012. On November 9, 2012, the court held a hearing in which it heard from Defendant's attorney that Defendant had in fact been in custody in another jurisdiction, so the bench warrant for failing to appear had been issued in error. On December 13, 2012, the State moved to review Defendant's conditions of release. The State acknowledged that Defendant was in custody in Deming on October 3, 2012, when the court held its hearing on Defendant's earlier motion to continue. But the State contended that Defendant's conditions of release should be reviewed because "Defense counsel . . . has informed the State that . . . Defendant has failed to maintain contact with defense counsel, and there are no assurances that . . . Defendant will appear for trial on the scheduled trial date." The district court did not hold a hearing or otherwise dispose of the State's motion to review Defendant's conditions of release. Instead, it appears to have simply continued the December 2012 trial setting to April 10, 2013.

**{20}** On April 9, 2013, the day before trial, Defendant submitted a pro se motion to investigate and a motion to dismiss. In the motion to dismiss, Defendant made two arguments: (1) his arrest was unlawful, and (2) his right to a speedy trial had been violated. With respect to his speedy trial claim, Defendant argued that his case was simple and that the nearly two-and-one-half-year delay between his arrest and trial violated his right to a

5

speedy trial.

**{21}** The court heard argument on Defendant's motion to dismiss on the morning of trial on April 10, 2013. The district court denied Defendant's motion to dismiss based on an unlawful arrest, and Defendant has not appealed that ruling. With respect to the claim that his right to a speedy trial had been violated, Defendant argued that his case was simple and that the length of the delay resulted in a violation of his right to a speedy trial. Defendant's attorney indicated that Defendant's motion likely did not have any merit because he had "absconded" for a significant period of time between his arrest and the trial and, therefore, was himself responsible for much of the delay. Defendant conceded that he had absconded, saying "[y]eah, my mom was really sick."

**{22}** After the State's attorney responded, Defendant's attorney asked to be allowed to correct statements he had made earlier. Defendant's attorney stated:

> [Defendant] felt compelled to leave [the halfway house] because he had to have a surgery. Actually, they asked him to leave because of a medical problem that he had told them about and told them that he needed to get treatment on. So that changes the whole complexion of things.

The State responded that the halfway house Defendant was living in was a long-term inpatient program, which requires its patients to stay for a year to eighteen months. The State argued that Defendant "can't . . . really [have] been planning on going to trial in this case if he . . . [was in] an inpatient program for that length of time. And, again, if he left that program and ended up with a warrant, that still counts against [D]efendant and counts against his vigorous assertion of his right to a speedy trial[.]"

**{23}** The district court orally recited the history of the case and made certain findings of fact that we review in greater detail in our discussion of Defendant's speedy trial argument later in this Opinion. The court found that "most of the delay has been charged to [D]efendant; therefore, [the court] denies your motion to dismiss [on speedy trial grounds]." After trial, the district court entered a written order denying Defendant's motion to dismiss that again assigned most of the delay to Defendant and additionally found that "Defendant has not vigorously asserted the right to a speedy trial and there is no prejudice to . . . Defendant[.]"

**B.     Facts Relevant to Defendant's Sufficiency of the Evidence Argument**

**{24}** Immediately after denying Defendant's motion to dismiss, the court convened a jury venire, selected a jury, and proceeded to trial.

**{25}** Clorinda Barela testified that her daughter was living with Defendant in 2010. Defendant and her daughter had a son, and in September 2010, Ms. Barela had written a check for $10 to her grandson in order to purchase candy he was selling for a school

6

fundraiser. Ms. Barela saw that the check she had written was instead cashed for $200 at a Walmart. Ms. Barela obtained copies of receipts for the merchandise that had been purchased with the check and reported the issue to the police. Ms. Barela learned that her daughter had been identified as one of the individuals who had used the check at the Walmart.

**{26}**  Juliet Barela testified that her mother had given her son a check for a fundraiser and that Defendant had erased the amount for which the check was originally made and replaced it with $200 or $250. Juliet Barela said that Defendant had given her the check, she went into Walmart and purchased items with the check, and then returned the items for cash. Juliet Barela testified that she kept $30 of the proceeds, while Defendant kept the rest.

**{27}**  The State presented the testimony of Jack Waggoner. Mr. Waggoner testified that in October 2010, a check he had written to his telephone company was stolen from the mailbox in front of his house. On October 28, 2010, Mr. Waggoner's wife received a call from a check cashing business asking her whether her husband had hired anyone to perform work around the house for $250. When he went to the check cashing business to investigate, Mr. Waggoner was given a check he recognized to be the check he had written to Qwest, but it was made out to a man named Richard Tow. That check was admitted into evidence.

**{28}**  The State also presented the testimony of Velia Hernandez, the clerk at the check cashing business Mr. Waggoner had referenced in his direct testimony. Ms. Hernandez testified that on October 28, 2010, a man had attempted to cash a check that she felt did not look "like . . . a legit check." Ms. Hernandez called 411 to look up the phone number of Mr. Waggoner, who was identified on the check as the check's owner. When she called Mr. Waggoner, his wife answered, and told her not to cash the check. Ms. Hernandez then called the police, and the man who had come to cash the check fled.

**{29}**  The State called Mr. Tow to testify. Mr. Tow testified that Defendant had given him a check for some yard work he had performed for Defendant's relatives. Mr. Tow testified that he had initially tried to cash the check at a Wells Fargo, but decided to leave because the line for the teller was too long. Mr. Tow testified that he went to a nearby check cashing business to try and cash the check. He testified that the cashier appeared to have "a problem with the check. . . . I asked her if there was a problem, and she nodded to me that there was. So I left, went back and got in the vehicle and left. And [Defendant] was very upset with me. I remember he yelled at me, told me, well, why the hell did I leave the check there[?]"

**{30}**  Mr. Tow testified that Defendant was an acquaintance. Mr. Tow said that he had let Defendant borrow his truck, on the condition that Defendant purchase some new tires for the truck. Mr. Tow testified that Defendant had new tires put on the truck at Walmart and gave him a receipt for the $821.78 purchase. Although Mr. Tow recognized the description of his vehicle on the Walmart work order, he did not recognize the name of the person who had ordered the work, identified as "Marcos Silva."

**{31}** Finally, the State presented the testimony of Las Cruces Police Detective Frank Torres. Detective Torres testified that he was contacted by a man named Orton Keats, who had told police that a check he had written to pay a bill had been converted to a higher amount. Detective Torres was able to verify that Mr. Keats's check had been used to purchase a set of four tires at WalMart for $821.78. Detective Torres also obtained the work order from Walmart, which provided a license plate for the vehicle that the tires were installed on: Mr. Tow's truck.

**{32}** Detective Torres also testified that he investigated a police report made by Marcey Carter. Detective Torres testified that Ms. Carter had written a check to pay a bill and put it into her mailbox for mailing. Ms. Carter discovered that the check had cleared, but for a different amount, and had been used at Walmart. Detective Torres obtained surveillance footage from Walmart showing a man wearing white cowboy boots and a Dallas Cowboys sweatshirt making a purchase with Ms. Carter's check. Detective Torres testified that Mr. Tow had identified Defendant as the man in the surveillance video because Defendant always wears white cowboy boots.

**{33}** At the close of the State's case, Defendant moved for a directed verdict on all of the charges against him, which the district court denied. The jury acquitted Defendant of the four forgery charges but returned a guilty verdict on the conspiracy to commit forgery charge.

## II.    DISCUSSION

**{34}** Defendant raises two arguments on appeal: (A) there was insufficient evidence to support the jury's guilty verdict on the indictment's conspiracy to commit forgery charge, and (B) the district court erred in denying his motion to dismiss the indictment on speedy trial grounds. We address each argument in turn.

### A.    There Was Sufficient Evidence for a Rational Jury to Conclude That Defendant Had Conspired to Commit Forgery

**{35}** Defendant's first issue on appeal challenges the sufficiency of the evidence supporting the jury's guilty verdict on the conspiracy to commit forgery charge. When a defendant challenges the sufficiency of the evidence supporting a criminal conviction, we review the record to determine whether

> sufficient evidence was adduced to support the underlying charge. The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction. When considering the sufficiency of the evidence, [an appellate court] does not evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence. Instead, [the reviewing courts] view the evidence as a whole and indulge all reasonable

8

inferences in favor of the jury's verdict while at the same time asking whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt[.]

*State v. Sena*, 2008-NMSC-053, ¶ 10, 144 N.M. 821, 192 P.3d 1198 (internal quotation marks and citations omitted).

**{36}** Conspiracy consists of "knowingly combining with another for the purpose of committing a felony within or without [New Mexico]." NMSA 1978, § 30-28-2(A) (1979). The jury was given an instruction modeled after UJI 14-2810 NMRA, the pattern jury instruction for conspiracy. That instruction read as follows:

> For you to find [D]efendant guilty of conspiracy to commit forgery . . ., the [S]tate must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1.      [D]efendant and another person by words or acts agreed together to commit forgery;
>
> 2.      [D]efendant and the other person intended to commit forgery;
>
> 3.      This happened in New Mexico on or between July 1, 2010 and November 1, 2010.

**{37}** The jury was also given four instructions corresponding to each forgery charge. The instructions stated:

> For you to find [D]efendant guilty of forgery as charged in Count[s 1, 2, 3, or 4,] the [S]tate must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
>
> 1.      [D]efendant changed a genuine check so that its effect was different from the original;
>
> 2.      At the time, [D]efendant intended to injure, deceive[,] or cheat [Clarinda Barela, Jack Waggoner, Orton Keats, Marcey Carter,] or another;
>
> 3.      This happened in New Mexico on or between July 1, 2010 and November 1, 2010.

Thus, in order for the jury to find Defendant guilty of conspiracy to commit forgery, it needed to conclude beyond a reasonable doubt that between July 1 and November 1, 2010, Defendant had by words or acts agreed to change a genuine check so that its effect was different from the original, with intent to injure Clarinda Barela, Jack Waggoner, Orton

9

Keats, Marcey Carter, or another.

**{38}**     Defendant concedes that the State established beyond a reasonable doubt that "four personal checks belonging to four different people were washed and passed at four different times[,]" but argues that the "single Walmart image of him leaving the store . . . [at the] time of the passing of one check in question and the self-serving statements of two co-defendants" was insufficient to establish that Defendant washed and passed the checks. But the jury need not have been convinced that Defendant was the one who washed or passed checks; it only needed to conclude that Defendant had entered into an agreement with another (presumably either Mr. Tow or Juliet Barela) to wash and pass the checks. *See*, *e.g.*, *State v. Olguin*, 1994-NMCA-050, ¶ 36, 118 N.M. 91, 879 P.2d 92 ("[W]e . . . uphold the conviction for conspiracy, notwithstanding that one of the underlying crimes may not have been supported by sufficient evidence."), *aff'd in part, set aside in part by* 1995-NMSC-077, 120 N.M. 740, 906 P.2d 731.

**{39}**     Defendant next takes issue with the sufficiency of the State's proof of an agreement. We note that conspiracies may be (and often are) proven with circumstantial evidence. *See State v. Sheets*, 1981-NMCA-064, ¶ 13, 96 N.M. 75, 628 P.2d 320. Defendant appears to acknowledge that the circumstantial evidence alone is enough to resolve this argument against him because Mr. Tow and Juliet Barela both offered testimony from which a jury could infer the existence of a conspiracy: Mr. Tow's testimony that Defendant had agreed to obtain a new set of tires for Mr. Tow's truck in exchange for letting Defendant borrow it; and Juliet Barela's testimony that she and Defendant had agreed to wash and use her mother's check at Walmart, sharing the proceeds. By characterizing the testimony of Mr. Tow and Juliet Barela as "self-serving," Defendant is in essence conceding that his sufficiency of the evidence challenge to his conviction for conspiracy turns on a challenge to the jury's decision to credit the testimony of Mr. Tow and Juliet Barela, a decision which we are powerless to review on appeal. *See State v. Nichols*, 2006-NMCA-017, ¶ 9, 139 N.M. 72, 128 P.3d 500; *see also State v. Hernandez*, 1993-NMSC-007, ¶ 69, 115 N.M. 6, 846 P.2d 312 (recognizing that the appellate courts' . . . "duty on appeal is neither to substitute our judgment for that of the jury nor reweigh the evidence"). The fact that the jury acquitted Defendant of the offenses that formed the object of the charged conspiracy is not controlling or determinative. *See State v. Armijo*, 1931-NMSC-008, ¶ 7, 35 N.M. 533, 2 P.2d 1075 ("It is quite possible for [the defendants] to have conspired to commit [larceny], without having committed, the larceny."); *see also State v. Gilbert*, 1982-NMCA-081, ¶ 20, 98 N.M. 77, 644 P.2d 1066 (recognizing that "the crime of conspiracy is complete when the felonious agreement is reached").

**{40}**     For the foregoing reasons, we reject Defendant's sufficiency of the evidence challenge to his conviction for conspiracy to commit forgery.

**B.     The District Court Did Not Err in Denying Defendant's Motion to Dismiss on Speedy Trial Grounds**

**{41}** The Speedy Trial Clause of the Sixth Amendment of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial[.]" U.S. Const. amend. VI. "The heart of the right to a speedy trial is preventing prejudice to the accused." *State v. Garza*, 2009-NMSC-038, ¶ 12, 146 N.M. 499, 212 P.3d 387. The right to a speedy trial "is unique among the constitutional guarantees afforded a criminal defendant because of the concomitant 'societal interest in bringing an accused to trial.'" *State v. Serros*, 2016-NMSC-008, ¶ 4, 366 P.3d 1121 (quoting *Garza*, 2009-NMSC-038, ¶ 12). "As a result, merely showing delay in bringing an accused's case to trial is not enough to establish a speedy trial violation; rather, [the appellate courts] must scrutinize every claimed violation to determine whether the accused has suffered an actual and articulable deprivation of the right to a speedy trial." *Serros*, 2016-NMSC-008, ¶ 4 (internal quotation marks and citation omitted).

**{42}** We evaluate Defendant's claim that his Sixth Amendment right to a speedy trial was violated using the four factors set out in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay in bringing the case to trial, (2) the reasons for the delay, (3) the defendant's assertion of the right to a speedy trial; and (4) the prejudice to the defendant caused by the delay." *Id.*; *see also Serros*, 2016-NMSC-008, ¶ 5.

### 1.      Length of Delay

**{43}** "The first factor, the length of delay, has a dual function: it acts as a triggering mechanism for considering the four *Barker* factors if the delay crosses the threshold of being presumptively prejudicial, and it is an independent factor to consider in evaluating whether a speedy trial violation has occurred." *Serros*, 2016-NMSC-008, ¶ 22. As to the first function, our Supreme Court "[has] established benchmarks for presumptively prejudicial delay according to the complexity of a case: one year for a simple case, 15 months for a case of intermediate complexity, and 18 months for a complex case." *Id.* ¶ 22 (citing *Garza*, 2009-NMSC-038, ¶ 48). In this case, the State concedes (and we agree) that the twenty-nine month, twenty-two day-long delay between Defendant's arrest and his trial is sufficient to trigger further analysis for a speedy trial violation regardless of the complexity of the case.

**{44}** As to the second, "independent" function that the first *Barker* factor performs, our Supreme Court has stated that "[t]he length of delay is an objective determination that is capable of measurement with some precision, and once established, it colors the rest of the speedy trial analysis. A delay that crosses the threshold for presumptive prejudice necessarily weighs in favor of the accused; the only question is, how heavily?" *Serros*, 2016-NMSC-008, ¶ 26. Importantly, "the parties' fault in causing the delay is irrelevant to the analysis" of this factor. *Id.* "A delay that scarcely crosses the bare minimum needed to trigger judicial examination of the claim is of little help to a defendant claiming a speedy trial violation." *Id.* (internal quotation marks and citation omitted). "Conversely, an extraordinary delay . . . weighs heavily in favor of a defendant's speedy trial claim, bearing in mind that no single factor is dispositive of whether a violation has occurred." *Id.*; *See Garza*, 2009-NMSC-038, ¶ 24.

11

**{45}**     As an initial matter, we note that our Supreme Court in *Serros* did not explain how to determine the difference between a presumptively prejudicial delay that "scarcely crosses the bare minimum needed" and provides "little help to a defendant" versus the additional length of delay that would be considered "extraordinary" and that "weighs heavily in favor of a defendant's speedy trial claim." *Id.* (internal quotation marks and citation omitted). In *Serros*, our Supreme Court concluded that weighing the first factor heavily in the defendant's favor was not a "difficult question" because the fifty-one month long delay between the defendant's arrest and the dismissal of his indictment for speedy trial violations was far in excess of the amount needed to create a presumption of prejudice. *Id.* ¶ 24.

**{46}**     Here, the nearly twenty-nine month delay between Defendant's arrest and his trial is more than the "bare minimum needed" to show presumptive prejudice, but significantly shorter than the fifty-one month delay that *Serros* concluded weighed heavily in the defendant's favor as a matter of course. *Id.* ¶ 26 (internal quotation marks and citation omitted). Moreover, the district court in this case did not make an express finding as to the complexity of Defendant's case. The complexity of this case does not matter to our determination of presumptive prejudice because the amount of delay is sufficient to trigger a speedy trial analysis regardless of the case's complexity. *See id.* ¶ 23 (concluding the delay presumptively prejudicial without determining the case's complexity). But with respect to how we are to evaluate this length of delay factor, the complexity of this case takes on considerable importance. If the case is classified as simple, then the delay exceeds the threshold for presumptive prejudice by seventeen months; if intermediate, fourteen; if complex, only eleven. *See id.* ¶ 22 (recognizing that the amount of time that must elapse for delay to become presumptively prejudicial is "one year for a simple case, 15 months for a case of intermediate complexity, and 18 months for a complex case" (citing *Garza*, 2009-NMSC-038, ¶ 48)).

**{47}**     The State argues that this is a case of "intermediate" complexity based on "the number of potential witnesses and scenarios that were involved." Specifically, the State asserts that it was required to prepare for a trial involving testimony of the checks' owners, the employees of the businesses where Defendant allegedly passed the checks off, records custodians who could lay the foundation for the admission of surveillance camera footage, and any law enforcement personnel involved in the investigations that led to Defendant's arrest. We agree that the State's assessment of this case's complexity is reasonable, and accordingly, find that the length of the delay in this case was fourteen months in excess of the amount necessary to trigger judicial scrutiny.

**{48}**     In *Serros*, our Supreme Court concluded that a fifty-one month delay between the defendant's arrest and the dismissal of the indictment against him on speedy trial grounds was "extreme" and therefore justified weighing the first *Barker* factor heavily in the defendant's favor. *Serros*, 2016-NMSC-008, ¶ 24. By contrast, in *Garza*, our Supreme Court determined that a delay that only exceeded the amount required to trigger further judicial analysis by a month and six days "was not extraordinary and [did] not weigh heavily in [the d]efendant's favor." *Garza*, 2009-NMSC-038, ¶ 24. Here, the delay in this case exceeds the

12

amount required to trigger further analysis by fourteen months. This delay is far more than the "bare minimum needed to trigger judicial examination of the claim." *Id.* (internal quotation marks and citation omitted). Accordingly, we conclude that this factor weighs heavily in Defendant's favor.

## 2. The Reasons Behind the Delay

**{49}** The district court found that most of the delay in this case was attributable to Defendant. As we have stated above, we give deference to the district court's finding of fact that Defendant caused most of the delay in this case, to the extent it is supported by substantial evidence in the record. *See Serros*, 2016-NMSC-008, ¶ 20.

**{50}** Defendant argues that the State is responsible for twenty-four out of the twenty-nine months of delay in this case. Defendant asserts that the delay between February 2011 and February 2012 was caused by the State's filing of a motion to join Defendant's case with that of his alleged co-conspirators' and the district court's negligent failure to timely rule on the motion. Defendant argues that the State is responsible for another two months of delay caused by its mistaken belief that Defendant had absconded from custody when he was in fact in prison, thus causing the district court to issue a bench warrant and continue the October 2012 trial setting to December 2012. Finally, Defendant argues that he should not be held responsible for the delays between April 2012 and April 2013, which Defendant argues was caused by motions to continue filed by his trial counsel which he did not consent to filing. We assess and assign responsibility for the delays in this case chronologically.

**{51}** We agree with Defendant that the delay caused by the State's motion to join (and the district court's failure to rule on the motion) is properly weighed in Defendant's favor. Accordingly, twelve of the twenty-nine month period of delay in this case weighs in Defendant's favor. In doing so, we reject the State's argument that the delay should not be weighed against it because the motion had merit and was ultimately granted as unopposed in modified form. Whatever the merit of the motion, the State's decision to file it occasioned the district court's delay until it ruled on the motion. Accordingly, this period of time is appropriately weighed more heavily against the State. *See Garza*, 2009-NMSC-038, ¶¶ 26-30 (noting that delays caused by administrative burdens on the court system are typically weighed slightly in the defendant's favor, but the more "protracted" the delay, the more heavily it is weighed in the defendant's favor).

**{52}** We disagree with Defendant's assertion that the period of delay from April 2012 to April 2013 is the fault of the State. Defendant argues that he asserted his right to a speedy trial by filing a pro se motion to dismiss his attorney in which he also demanded to proceed to trial. We are mindful that the right to a speedy trial and the right to effective assistance of counsel are not mutually exclusive. *Serros*, 2016-NMSC-008, ¶ 81. In this regard, when assessing a period of delay caused by a defendant's pro se motion to discharge his attorney, our Supreme Court identified the reasonableness of such a request as the relevant inquiry in determining whether to assign the resultant delay to the defendant or the state. *Id.* ¶¶ 53-54.

13

As we explain below, we think that there is substantial evidence to support the district court's finding that Defendant, not his counsel, is responsible for this period of delay.

{53}    In his pro se motion to dismiss his attorney, filed about two weeks before the April 2012 trial setting, Defendant asserted that his attorney was not communicating with him, not preparing his case for trial, and not providing him with discovery. But against these assertions of fact, Defendant's attorney said that he had communicated with Defendant, was preparing the case for trial, and had provided Defendant with discovery from the State. Although Mr. Pineda did not submit an affidavit or otherwise testify to his assertions of fact, neither did Defendant. Moreover, Mr. Pineda called his administrative assistant to testify that Defendant had called and told her that he had obtained another attorney who would be suing Mr. Pineda and taking over Defendant's case. Because Defendant had denied making such an assertion, Mr. Pineda's assistant's testimony undermined Defendant's credibility and provided the district court with a substantial basis for concluding that Defendant's effort to fire his attorney was a "last-minute plea[] to change counsel [that] should be []viewed skeptically[,]" not a reasonable invocation of his right to effective trial counsel. *Id.* ¶ 53. Accordingly, we assign to Defendant the delay caused by the district court's continuance of the April 26, 2012, trial date to July 31, 2012.

{54}    Defendant's replacement counsel moved to continue the July 31, 2012, trial date based on the need to conduct additional investigation. Defendant's attorney stated that Defendant had been under the mistaken impression that counsel for his co-Defendant, Mr. Tow, was his attorney, and that this caused several weeks of delay. Once this misunderstanding had been cleared up, Defendant requested that his attorney conduct additional investigation and track down additional witnesses who Defendant wanted to call to testify in his defense. Although these requests are hardly unreasonable, it does not follow that any delay that resulted must be weighed against the State. The district court did not err in concluding that Defendant should be assigned responsibility for the delay caused by continuing the July 31, 2012, trial setting to October 11, 2012.

{55}    We disagree as well with Defendant that the State caused the delay between October 2012 and December 2012. This period of delay was not caused by the district court's mistaken issuance of a bench warrant for Defendant's arrest, as defendant argues; rather, it was caused by Defendant's attorney filing a motion at Defendant's behest that trial be continued until after April 2014 in order to allow Defendant to finish an inpatient treatment program at a halfway house. It is worth noting that the State opposed Defendant's motion to continue, arguing that granting the motion would create speedy trial concerns. The State also presented evidence at the hearing on the motion that tended to refute Defendant's claim that he was actually enrolled in an inpatient treatment program. To be sure, confusion over Defendant's location might have caused the district court to mistakenly issue a bench warrant and may have figured into the district court's decision to delay the trial. But the occasion for the delay in the first place was Defendant's request to continue the trial for nearly two years, which the State opposed, and Defendant's decision to leave the halfway house to seek medical attention, which contributed to the confusion over Defendant's

location. We see no error in the district court's determination that Defendant should be held responsible for this period of delay.

**{56}** Although the district court did not enter an order or otherwise explain why it was continuing the December 17, 2012, trial setting, it appears that the reason for the continuance was the State's December 13, 2012, motion to revoke Defendant's conditions of release. In that motion, the State stated that it had been told by Defendant's attorney that "Defendant has failed to maintain contact with defense counsel, and there are no assurances that . . . Defendant will appear for trial on the scheduled trial date." Defendant later conceded on the morning of trial that he had failed to stay in contact with his attorney. Although it is not clear whether Defendant failed to stay in contact with his attorney in order to purposefully delay the December 17, 2012, trial, this evidence provided a sufficient basis for the district court to find that Defendant "affirmatively cause[d] or acquiesce[d]" in this period of delay. *Serros*, 2016-NMSC-008, ¶ 74.

**{57}** In sum, twelve months of the delay in this case can be assigned to the State; Defendant caused or acquiesced in the remaining sixteen months' delay. Since the majority of the delay in this case was caused by Defendant, we conclude that application of the second *Barker* factor "tip[s] the balance back in favor of the societal interest in bringing [the d]efendant to trial" and ultimately weighs in favor of the State. *Serros*, 2016-NMSC-008, ¶ 28 (internal quotation marks and citation omitted).

### 3. Defendant's Assertion of the Right to a Speedy Trial

**{58}** The third *Barker* factor looks to "the frequency and force of the objections[,] as opposed to attaching significant weight to a purely pro forma objection." *Barker*, 407 U.S. at 529. The right to a speedy trial is

> fundamental in nature so that a failure to assert [it] does not constitute waiver, but the timeliness and vigor with which the right is asserted may be considered as an indication of whether a defendant was denied needed access to speedy trial over his objection or whether the issue was raised on appeal as [an] afterthought.

*Garza*, 2009-NMSC-038, ¶ 32.

**{59}** Here, Defendant argues that the two speedy trial demands filed by his appointed attorneys and his pro se invocations of the right to a speedy trial in his first motion to dismiss his attorney, his motion for a telephonic setting, and his motion to dismiss the indictment filed on the eve of trial in April 2013 demonstrate that he frequently and forcefully asserted his right to a speedy trial.

**{60}** In *Garza*, our Supreme Court held that the defendant's single speedy trial demand, "preceding his motion to dismiss, tucked within the waiver of arraignment and not guilty

15

plea, was sufficient to assert his right." *Id.* ¶ 34. The Court noted that although the defendant's single invocation of his right to a speedy trial "was not especially vigorous[,]" the fact that the defendant had not otherwise acquiesced in the delay required the third *Barker* factor to be weighed slightly in his favor. *Id.*

**{61}** Here, Defendant invoked his right to a speedy trial five times—twice through his lawyers, and three times through pro se motions to discharge his attorney, set a telephonic hearing, and to dismiss the indictment. Although Defendant invoked his right to a speedy trial many more times than the defendant did in *Garza*, this fact is mitigated by the context of Defendant's invocations of the right to a speedy trial: as we have explained above, Defendant's first two pro se motions to dismiss were filed on the eve of trial and sought a new attorney as the primary relief. Defendant's pro se motion to dismiss was likewise filed on the eve of his April 2013 trial, which ultimately went forward after it was denied. And against Defendant's invocations of his right to a speedy trial, Defendant at least once sought to delay his trial by more than two years in order to avoid violating his conditions of release for an unrelated criminal conviction.

**{62}** Under these circumstances, we cannot say that the district court's finding that Defendant did not frequently or forcefully invoke his right to a speedy trial lacks a substantial basis. *See Garza*, 2009-NMSC-038, ¶ 32 (quoting *Sisneros v. State*, 121 P.3d 790, 800 (Wyo. 2005), for the proposition that the third *Barker* factor should be weighed neutrally where the defendant "demanded a speedy trial throughout the proceedings, but 'also engaged in procedural maneuvers which had the result of delaying the trial' "). Accordingly, we cannot reverse the district court's ultimate finding to weigh the third *Barker* factor neutrally.

### 4.     The Prejudice to Defendant Caused by the Delay

**{63}** The United States Supreme Court in *Barker* explained the "actual prejudice" prong of the constitutional speedy trial analysis as follows:

> Prejudice . . . should be assessed in the light of the interests of [the] defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.

407 U.S. at 532; *see State v. Maddox*, 2008-NMSC-062, ¶ 32, 145 N.M. 242, 195 P.3d 1254, *abrogated on other grounds by Garza*, 2009-NMSC-038, ¶¶ 47-48.

**{64}** "Ordinarily, a defendant bears the burden of proof on this factor by showing 'particularized prejudice' when claiming a speedy trial violation." *Serros*, 2016-NMSC-008, ¶ 86 (quoting *Garza*, 2009-NMSC-038, ¶ 39). "However, if the length of delay and the reasons for the delay weigh heavily in [the] defendant's favor and [the] defendant has

16

asserted his right and not acquiesced to the delay, then the defendant need not show prejudice for a court to conclude that the defendant's right has been violated." *Serros*, 2016-NMSC-008, ¶ 86 (internal quotation marks and citation omitted).

**{65}** At the hearing on Defendant's final motion to dismiss on speedy trial grounds, the district court explained why it concluded Defendant had failed to demonstrate particularized prejudice. The court stated:

> [W]ithout going through all the dates of when he was arrested, where he was arrested and why he was arrested, [I am] unable to state whether he served any—much, if any, pretrial incarceration time on this case. I know he was brought here from Luna County, so he's currently in custody in Luna County. So I don't think there is going to be [any] impressive pretrial incarceration. With regard to it having any impact on his ability to mount a defense, I've heard nothing about that today.

**{66}** Defendant first argues that the district court erred by assigning the burden of proving prejudice instead of requiring the State to prove the absence of prejudice. But *Salandre v. State*, 1991-NMSC-016, 111 N.M. 422, 806 P.2d 562, the case that Defendant cites in support of this proposition, was modified by *Garza*, which expressly held that *Salandre* should not be read to impose on the State a burden of disproving prejudice. *See Garza*, 2009-NMSC-038, ¶¶ 15-24 ("In light of the overwhelming consensus among the federal Circuit Courts of Appeals and our policy of providing a functional analysis based on the facts and circumstances of each case, we abolish [*Salandre*'s] presumption that a defendant's right to a speedy trial has been violated based solely on the threshold determination that the length of delay is 'presumptively prejudicial.' "). Under *Garza*, Defendant bears the burden to identify and sufficiently establish particularized prejudice stemming from the presumptively prejudicial delays in this case.

**{67}** In this regard, Defendant argues that his pro se motions to dismiss his attorney and dismiss the indictment on speedy trial grounds "express[] overwhelming concern over the status of his case[.]" Defendant also points out that he was incarcerated for a significant portion of the delays at issue. These facts, Defendant claims, refute the district court's conclusion that Defendant did not suffer particularized prejudice as a result of the presumptively prejudicial delays in this case.

**{68}** The problem with this argument is that it depends on two factual inferences that the district court was free to ignore given evidence tending to refute Defendant's claim that he had long been asserting his speedy trial rights and had not caused the delays at issue. The first inference is that Defendant's expressions of "overwhelming concern over the status of his case" in his pro se motions were sincere. *See Serros*, 2016-NMSC-008, ¶ 88 (finding particularized prejudice prejudice based on lengthy pretrial incarceration based on the defendant's "*unchallenged* testimony at the hearing on his motion to dismiss, in which he described his living conditions for the previous four years"). Here, Defendant's attorney

provided evidence that Defendant was seeking to fire him not because of a lack of communication but because he was unhappy with the State's plea offer, and Defendant had deliberately sought to sabotage the attorney-client relationship by seeking out another attorney and threatening to sue him. Given this evidence, the district court could permissibly view Defendant's speedy trial complaints as part of an effort to derail the case on the eve of trial, not a genuine desire for finality.

**{69}**     The second inference is that Defendant's pretrial incarceration was caused by the delays in this case. As Defendant concedes, he was released on bond roughly six months after his arrest. While this period of incarceration can certainly be considered prejudicial in the present case, it cannot simply be lumped together with the periods of incarceration that resulted from Defendant's parole violations in unrelated cases, as the district court noted in its oral findings on prejudice. Properly assigned, it is clear that Defendant was incarcerated based upon the instant charges for at most six months of the total period of delay at issue in this case. We do not think that the prejudice Defendant suffered as a result of his incarceration after his arrest in the present case is enough to find that Defendant was prejudiced by the entire twenty-nine month delay in this case. *Cf. Id.*, 2016-NMSC-008, ¶ 93 (upholding a district court's finding of prejudice arising from the defendant's incarceration in administrative segregation for the entire period of pretrial delay). Indeed, the record indicates Defendant was in and out of jail following his initial satisfaction of bail in this case based upon his own actions before and after the relevant arrest and release from incarceration in the present case.

**{70}**     Defendant finally argues that because of the delays in bringing his case to trial, he suffered particularized prejudice because he lost the opportunity to serve his sentence in this case concurrently with his sentences for unrelated criminal convictions. *See State v. Zurla*, 1990-NMSC-011, ¶ 23, 109 N.M. 640, 789 P.2d 588 ("[The appellate courts] believe loss of the possibility of serving concurrent sentences did constitute an aspect of prejudice."). But *Zurla*, which Defendant cites in support of his argument, weighed the second *Barker* factor heavily against the state, finding that its negligence was the cause of all of the delays at issue. *Zurla*, 1990-NMSC-011, ¶¶ 14-17. Here, as we have already explained, a significant amount of the delay in this case was caused by Defendant. Without explaining how the delays caused by the State (rather than those caused by Defendant) resulted in Defendant's lost opportunity to serve concurrent sentences, we do not think Defendant has demonstrated particularized prejudice on this ground.

**{71}**     For the foregoing reasons, we conclude that the district court correctly found that Defendant had failed to demonstrate particularized prejudice arising from the delays in this case.

### 5.     Balancing the Factors

**{72}**     To recapitulate, the first *Barker* factor strongly favors Defendant; the nearly twenty-nine month long delay in this case exceeds the amount of time that a criminal case of

intermediate complexity is presumed to require. *See Serros*, 2016-NMSC-008, ¶ 23. However, this is the only *Barker* factor that ultimately weighs in Defendant's favor. As for the second *Barker* factor, Defendant expressed his desire to bring his case to trial but inconsistently interposed numerous delays and requested continuances of scheduled trial dates, all reasons for delay that weigh in the State's favor. We attach particular importance to Defendant's repeated efforts to delay trial by more than two years in order to prioritize fulfilling his conditions of probation in an unrelated case. Ultimately, the district court accurately weighed this second *Barker* factor in favor of the State. Defendant's inconsistent assertions of his speedy trial right while simultaneously requesting continuances of trial settings also supported the district court's determination regarding the third *Barker* factor, a reasonably vigorous assertion of one's right to a speedy trial. We conclude that assigning neutrality to this third *Barker* factor was not error under the facts presented in this case. Finally, Defendant failed to identify or establish particularized prejudice under the fourth *Barker* factor. As a result, our de novo review of all four speedy trial factors support the district court's conclusion that Defendant's speedy trial rights were not violated.

### III.   CONCLUSION

**{73}**   We affirm the district court's denial of Defendant's motion to dismiss on speedy trial grounds. We also reject Defendant's challenge to the sufficiency of the evidence supporting his conviction for conspiracy to commit forgery.

**{74}**   Defendant's conviction is affirmed.

**{75}   IT IS SO ORDERED.**

 

_____
**J. MILES HANISEE, Judge**

**WE CONCUR:**

_____
**JONATHAN B. SUTIN, Judge**

_____
**TIMOTHY L. GARCIA, Judge**